[Cite as *In re D.R.*, 2024-Ohio-1749.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN RE: D.R.

JUDGES:
Hon. William B. Hoffman, P.J.
Hon. John W. Wise, J.
Hon. Craig R. Baldwin, J.

Case No. 2024CA00003

O P I N I O N

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Appeal from the Stark County Court of Common Pleas, Family Court Division, Case No. 2022JCV00423 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | May 3, 2024 |

APPEARANCES:

For Appellee

CRIS EOFF
BRANDON J. WALTENBAUGH
Stark County Department of Job &
Family Services - Legal Counsel
221 – 3rd Street, S.E.
Canton, Ohio 44702

For Appellant

KATHALEEN S. O'BRIEN
116 Cleveland Avenue, N.W., Suite #303
Canton, Ohio 44702

Guardian ad litem

DEAN GRASE
116 Cleveland Avenue, N.W., Suite #700
Canton, Ohio 44702

*Hoffman, P.J.*

**{¶1}** Appellant B.R. ("Father") appeals the December 6, 2023 Judgment Entry entered by the Stark County Court of Common Pleas, Family Court Division, which terminated his parental rights, privileges, and responsibilities with respect to his minor child ("the Child") and granted permanent custody of the Child to appellee Stark County Department of Job and Family Services ("SCJFS").

STATEMENT OF THE CASE AND FACTS

**{¶2}** Father and R.R. ("Mother") are the biological parents of the Child.  On April 18, 2022, SCJFS filed a complaint, alleging the Child was dependent, neglected, and/or abused.

**{¶3}** SCJFS had investigated the family on numerous occasions due to concerns related to Father's anger management issues, the Child having injuries of unknown origin, Mother's physical limitations due to cerebral palsy, Mother's mental health issues, and the home conditions.  SCJFS became involved with the family again in March, 2022, after receiving a report the Child had petechiae and scratches around the neck, as well as bruises on the right cheek, the back, and the arms, which the Child stated were caused by Father throwing the Child off the bed.  The home conditions were unsanitary, and the Child had lice. Following an assessment at Akron Children's Hospital, medical personnel concluded the Child's "injuries were concerning for physical abuse."  Complaint at p. 2, unpaginated.  The Child was diagnosed with failure to thrive, secondary to nutritional

neglect, and medical neglect related to plagiocephaly.[1]  The Child also was developmentally delayed.

**{¶4}**  Father and Mother agreed to an out-of-home safety plan with the Child's paternal great aunt and uncle.  On April 14, 2022, the relative caregivers asked SCJFS to remove the Child from their home as soon as possible as they were no longer willing or able to provide full-time care for the Child.  The filing of the complaint followed.

**{¶5}**  The trial court conducted an emergency shelter care hearing on April 19, 2022, and placed the Child in the temporary custody of SCJFS.  On April 20, 2022, the trial court appointed Attorney Dean Grase as guardian ad litem ("GAL") for the Child.  At the adjudicatory hearing on May 11, 2022, Father and Mother stipulated to a finding of neglect.  SCJFS dismissed the allegations of dependency and abuse.  The trial court found the Child to be neglected and ordered the Child remain in the temporary custody of SCJFS. The trial court also approved and adopted the case plans for Father and Mother. The trial court conducted review hearings on October 14, 2022, and March 14, 2023, and maintained the status quo.

**{¶6}**  SCJFS filed a motion to extend temporary custody on March 9, 2023.  The trial court conducted a hearing on the motion on April 18, 2023.  Father and Mother stipulated to the extension.  The trial court extended SCJFS's temporary custody of the Child to October 18, 2023.

**{¶7}**  On September 6, 2023, SCJFS filed a motion for permanent custody.  Due to a failure to properly notarize its first motion for permanent custody, SCJFS filed an

---

[1] " 'Plagiocephaly' is an umbrella term used to describe different types of skull deformations, including flat head syndrome." See, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/10691 plagiocephaly-flat-head-syndrome. Accessed 29 March 2024.

amended motion for permanent custody on September 13, 2023. Mother filed a motion for change of legal custody of the Child to a maternal aunt. The GAL filed his final report on November 28, 2023, recommending permanent custody of the Child be granted to SCJFS. The GAL also recommended Mother's motion for change of legal custody be denied as any further change in the Child's placement would "almost certainly be highly detrimental to [the Child]." November 28, 2023 Report of Guardian ad Litem.

{¶8} On December 5, 2023, the trial court conducted a hearing on SCJFS's motion for permanent custody and Mother's motion to change legal custody. The following evidence was presented at the hearing.

{¶9} Kelli Williams, the SCJFS caseworker assigned to the family, testified the Agency became involved with the family in March, 2022, after receiving a report the Child had petechiae eye, scratches on the neck, and bruises on the face, neck, back, and arms. The Child stated Father had thrown the Child out of the bed. The Child missed several days of school due to these injuries. The Child revealed incidents of domestic violence including Father cutting Mother with a knife. The Child also disclosed, and Mother admitted, Mother cut herself. The Child was diagnosed with failure to thrive. Williams noted SCJFS attempted an out-of-home safety plan with relatives, but after a month, the relatives were no longer able or willing to keep the Child in their home. Thereafter, SCJFS filed a complaint, and the Child was placed in a foster home.

{¶10} Williams detailed Father and Mother's case plans. Father and Mother were required to complete parenting assessments at Summit Psychological and follow all recommendations. In addition, Father and Mother were to complete Goodwill parenting

classes. Although Father and Mother completed the parenting classes, each received certificates of non-compliance. Goodwill did not recommend reunification.

**{¶11}** Father's case plan included anger management at Melymbrosia. Father attended a couple of sessions, but stopped attending because he did not like the way the staff spoke to him and refused to return. Father was required to submit to random alcohol testing as alcohol was tied to some of the domestic violence incidents. At the time of the hearing, Father had not complied with testing at CommQuest.

**{¶12}** Williams noted SCJFS had been involved with the family "at least once a year [during the course of the Child's short life] to tend to concerns of neglect." Transcript of Proceedings at p. 10. The unsanitary home conditions were an ongoing concern. The home was filthy with dog feces and vomit on the floor. The house was also infested with mice. Father trapped the mice and then held them in an aquarium, explaining he planned to release them all at once. Williams explained neither Mother nor Father appreciated the unlivable conditions of the home.

**{¶13}** With respect to the Child, Williams stated the Child has made substantial progress. The Child had been diagnosed with failure to thrive, but after being hospitalized and in foster care, the Child has gained weight. The Child had significant speech delays, but has made tremendous progress in that regard. The Child is engaged in speech therapy and has an IEP ("individual education plan") at school. Although Mother and Father say they love the Child, Parents have not demonstrated that commitment by making the necessary changes.

**{¶14}** Regarding placement with the Child's aunt, Williams explained a home study was not conducted as SCJFS had already decided to place the Child with a school

intervention specialist and her husband. The intervention specialist worked with the Child. The Child had a relationship with the intervention specialist. The Child had never met the aunt until the aunt attended one visit. Although the aunt attended the visit, prior to it, she informed Williams she no longer wanted to pursue custody of the Child. Following the visit, the aunt told Williams the visit solidified the decision.

**{¶15}** Dr. Michael Stranathan, a psychology assistant with Summit Psychological Associates, completed Father's parenting evaluations. As part of the evaluation, Father completed the Minnesota Multi Phasic Personality Inventory ("MMPI") the Parenting Stress Index, which is an appraisal of the problems an individual experience in his/her relationship with his/her child as well as difficulties the individual experiences in parenting the child; and the Substance Abuse Subtle Screening Inventory, 4th Edition, which screens for substance use disorders. Dr. Stranathan also interviewed Father regarding his general parenting knowledge.

**{¶16}** Dr. Stranathan noted Father was "marginally cooperative" during the interview, offering "very little information" and quickly responding "no" or "not applicable." Tr. at p. 35. Dr. Stranathan expressed concerns regarding Father's tendency to minimize or deny the concerns which led to SCJFS's involvement. Father also minimized his own cognitive delays as well as his poor impulse control and anger management issues. Father failed to respond to a number of statements on the MMPI, which rendered the test invalid.

**{¶17}** Dr. Stranathan recommended Father engage in individual counseling to address his judgement and decision-making skills, and his anger management issues. Dr. Stranathan added Father should undergo random drug screening as he refused to

provide details regarding his substance use. Dr. Stranathan also recommended Father take an active role in attending the Child's medical appointments, and participate in parenting classes. Dr. Stranathan did not recommend unsupervised visits between Father and the Child until Father successfully and fully completed his recommendations.

{¶18} Jennifer Fire, the supervisor of the parenting program at Goodwill Industries, testified the parents involved in the program are provided with a variety of opportunities to obtain help for anything they might need. Neither Father nor Mother asked for individual help while they were in the program.

{¶19} When Fire and Amy Humerighouse, the Goodwill parenting instructor, arrived at the home for a scheduled visit, Fire had to stop Humerighouse from stepping in a pile of animal feces. Fire noted there were animal feces throughout the house. The entire home was filthy, there were piles of clothing strewn about, bags of dirty laundry shoved into closets which were covered in dust, and mildew and debris in the bathroom. The Child's bedroom was "a makeshift sunroom of sorts, on the first floor." Fire was concerned about the appropriateness of the Child's bedroom as there were no screens on the windows and the windows did not properly lock. The concerns with the home conditions were discussed with Parents prior to the visit. Fire concluded the condition of the home demonstrated Parents' refusal and/or inability to absorb what was being taught in the parenting classes.

{¶20} Fire testified Father accepted only minimal responsibility for SCJFS's involvement with the family. Father did not demonstrate changes following instruction on various topics during the course of the program. Father's anger management remained a significant concern. Father began anger management counseling, but claimed he was

mistreated by the counselor and refused to re-engage. Regarding visits, Fire recalled Father was more engaged with the Child than Mother, but the visits were not successful due to the family dynamics. Father disclosed feeling "stuck" in his relationship with Mother, fearing he would be charged with neglect if he left her.

**{¶21}** Kelly Williams testified during the best interest portion of the hearing. Williams indicated SCJFS had been involved with the family since April, 2022, approximately 19 months. When the Child arrived in SCJFS's custody, the Child had significant needs. The Child was diagnosed with failure to thrive, had significant speech delays, and had undiagnosed attention deficit hyperactivity disorder ("ADHD"). Williams stated the Child had "made tremendous progress in regard to her physical development and growth." Tr. at p. 74. The Child has an IEP at school due to her learning disability and was recently prescribed medication for ADHD. The Child works with a behavioral intervention specialist at school. The Child underwent genetic testing and a neurodevelopmental assessment at Akron Children's Hospital. The Child was diagnosed with post-traumatic stress disorder ("PTSD") due to the domestic violence witnessed in the home.

**{¶22}** The Child was in a foster home for approximately one year, however, the foster family was unable to keep the Child long term. The Child is currently in kinship placement. Williams testified the kinship provider is able to meet the Child's significant needs. The kinship provider is an intervention specialist at the Child's school and is versed in the special needs of the Child. The Child had a relationship with the kinship provider prior to the placement. The Child is happy in the placement and attached to everyone in the home.

**{¶23}** After the foster family was unable to continue caring for the Child, SCJFS investigated relative placement for the Child. Parents provided the name of an aunt. The aunt had never met the Child and SCJFS arranged for the aunt to meet the Child at a visit. SCJFS ultimately decided to place the Child with the kinship provider because of the Child's existing relationship with the kinship provider.  The Child expressed a desire to stay in the current situation.

**{¶24}** The Child did not appear to enjoy visits with Parents.  The Child has no problem separating at the end of the visits. Williams did not observe affection between the Child and Parents.  The Child called Parents by their first names despite being told to call them "Mom" and "Dad."  Williams did not believe the Child would be harmed if Parents' rights were severed. Williams added the benefit of permanency outweighed any harm. She further opined permanent custody was in the best interest of the Child.

**{¶25}** Via Judgment Entry filed December 6, 2023, the trial court terminated Parents' parental rights and granted permanent custody of the Child to SCJFS. The trial court found the Child had been in the temporary custody of SCJFS for twelve or more months of a consecutive 22-month period.  The trial court also found Parents failed to remedy the conditions which caused the Child's removal.  The trial court determined it was in the Child's best interest to grant permanent custody to SCJFS.

**{¶26}** It is from this judgment entry Father appeals, raising the following assignments of error:

I. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE STARK COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES (SCDJFS) AS SCDJFS FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT GROUNDS EXISTED FOR PERMANENT CUSTODY AND SUCH DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO STARK COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES (SCDJFS) AS SCDJFS FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT IT IS IN THE BEST INTERESTS OF THE MINOR CHILD TO GRANT PERMANENT CUSTODY AND SUCH DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶27}** This case comes to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

I, II

**{¶28}** As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries* (Feb. 10, 1982), Stark App. No. CA5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not

be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.* (1978), 54 Ohio St.2d 279.

**{¶29}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long term foster care.

**{¶30}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

**{¶31}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C.

2151.414(B)(1)(a) through (d)is present before proceeding to a determination regarding the best interest of the child.

**{¶32}** If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

**{¶33}** Father asserts SCJFS failed to prove, by clear and convincing evidence, any grounds to support the trial court's decision to grant permanent custody. We disagree.

**{¶34}** As set forth in our Statement of the Facts and Case, supra, we find there was sufficient and substantial competent evidence Father failed to remedy the problems which initially caused the removal of the Child from Parents' home, and the Child cannot or should not be placed with Parents in a reasonable time. Father minimally complied with his case plan. He began anger management counseling, but stopped attending because he felt he was being mistreated by the counselors. Father would not return to Melymbrosia to complete the program. Father did not comply with the case plan requirement he submit to random alcohol testing as alcohol was tied to some of the domestic violence incidents. Although Father attended Goodwill parenting, he failed to demonstrate any change during the program. Further, despite being provided with plenty of notice of the home visit, the house was unsanitary, and the Child did not have a safe and appropriate bedroom.

**{¶35}** Dr. Stranathan, who conducted Father's psychological evaluation, expressed concerns regarding Father's tendency to minimize or deny the concerns which led to SCJFS's involvement. Father also minimized his own cognitive delays as well as his poor impulse control and anger management issues. Father refused to provide Dr. Stranathan with any details regarding his substance use.

**{¶36}** The trial court also found, pursuant to R.C. 2151.414(B)(1)(d), the Child had been in the temporary custody of SCJFS for a period of time in excess of twelve of the prior twenty-two consecutive months. The 12 of 22 finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun,* 5th Dist. No. 2008CA00118, 2008-Ohio-5458, ¶ 45.

**{¶37}** Father further asserts the trial court's best interest finding is against the manifest weight of the evidence.

**{¶38}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (b) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in division (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶39} The juvenile court has considerable discretion in weighing these factors. *In re D.A.*, supra at ¶ 47. Although a trial court is required to consider each relevant factor under R.C. 2151.414(D)(1) in making a determination regarding permanent custody, "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Moreover, "[R.C. 2151.414(D)(1)] requires a weighing of all the relevant factors * * * [and] requires the court to find the best option for the child * * *." *Id.* at ¶ 64.

{¶40} When the Child arrived in SCJFS's custody, the Child had significant needs. The Child was diagnosed with failure to thrive, had significant speech delays, and had undiagnosed attention deficit hyperactivity disorder ("ADHD"). The Child has "made tremendous progress in regard to her physical development and growth." Tr. at p. 74. The Child has an IEP at school due to her learning disability and was recently prescribed medication for ADHD.

{¶41} The Child is currently in kinship placement. The kinship, who is an intervention specialist at the Child's school, is able to meet the Child's significant needs. The Child had a relationship with the kinship provider prior to the placement. The Child is happy in the placement and attached to everyone in the home.

{¶42} Parents identified an aunt for possible placement. The aunt had never met the Child and SCJFS arranged for a meeting at one of Parents' supervised visits. The aunt subsequently advised SCJFS she did not wish to pursue custody of the Child. SCJFS ultimately decided to place the Child with the kinship provider because of the Child's existing relationship with the kinship provider. The Child expressed a desire to stay in the current situation.

**{¶43}** The Child did not appear to enjoy visits with Parents. The Child has no problem separating at the end of the visits. The Child and Parents did not exhibit any affection towards each other. The Child called Parents by their first names despite being told to call them "Mom" and "Dad." Williams, the SCJFS caseworker assigned to the family, did not believe the Child would be harmed if Parents' rights were severed, and added the benefit of permanency outweighed any harm.

**{¶44}** Based upon the foregoing, we find the trial court's finding the Child could not and should not be placed with Parents in a reasonable time was not against the manifest weight. We further find the trial court's finding it was in the Child's best interests to grant permanent custody to SCJFS was not against the manifest weight of the evidence.

**{¶45}** Father's first and second assignments of error are overruled.

**{¶46}** The judgment of the Stark County Court of Common Pleas, Family Court Division, is affirmed.

By: Hoffman, P.J.

Wise, J. and

Baldwin, J. concur